Pamela K. LARSEN and Peter A. Larsen, Plaintiffs–Appellants,

v.

CITY OF BELOIT, Daniel T. Kelley, and Richard V. Holm, Defendants– Appellees.

No. 97–1831.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 24, 1997.

Decided Dec. 5, 1997.

Stuart H. Galesburg, Chicago, IL, for Pamela K. Larsen.

Michael V. Marsh, Patrick M. Ouimet (argued), Sarles & Ouimet, Chicago, IL, for Peter A. Larsen.

Thomas J. Basting, Sr. (argued), Brennan, Steil, Basting & MacDougall, Janesville, WI, for Defendants–Appellees.

Before CUMMINGS, BAUER and ROVNER, Circuit Judges.

CUMMINGS, Circuit Judge.

Peter Larsen was a police officer employed by the City of Beloit, Wisconsin. On January 4, 1985, he was shot twice in the head while attempting to apprehend a kidnapper. The wounds left Officer Larsen semi–comatose and quadriplegic. His wife, Pamela Larsen, is also his legal guardian. At the time of the shooting, the City of Beloit maintained a worker's compensation insurance policy with Home Insurance Company. This policy and the Wisconsin Worker's Compensation Act, Wis. Stat. § 102.42, required Home Insurance to pay all of Peter Larsen's

reasonable and necessary medical expenses indefinitely. See *Lisney v. Labor & Indus. Review Comm'n,* 171 Wis.2d 499, 493 N.W.2d 14, 22–23 (1992).

In the months following Officer Larsen's injury, Home Insurance disputed some claimed home care medical expenses and was frequently late in paying other medical bills. In response to these failures by Home Insurance and to a petition signed by some 5,800 Beloit citizens, the Beloit City Council on November 4, 1985 adopted a resolution entitled "Resolution Providing Care for Beloit Police Officer Peter Larsen." This resolution provided that the City would advance funds to pay the Larsens' bills for home care nursing and other medical expenses and then submit the bills to Home Insurance for reimbursement. Pamela Larsen claims that City Council member William Watson requested, in exchange for the City's passage of the resolution, that she refrain from filing any legal action against the City arising out of the shooting. She further claims that both she and the members of the City Council understood the resolution to be part of a bargain in which she agreed to assist the City in seeking reimbursement from Home Insurance and promised not to pursue legal action or seek publicity adverse to the City. The resolution's terms appear to have been implemented beginning soon after its passage.

About ten months later, on September 15, 1986, the City Council unanimously approved a four–page document entitled "Statement by City Council on Pete Larsen Care." This statement outlined the City's procedures for paying Officer Larsen's medical bills and seeking reimbursement from Home Insurance. In addition, the statement noted that the City had offered Pamela Larsen the services of its accountant to help her keep track of her husband's medical bills.

From 1986 until the summer of 1996, the City of Beloit paid most of the bills that the Larsens submitted to it and then submitted these bills to Home Insurance for reimbursement. It appears that Mrs. Larsen also submitted some medical bills directly to

Home Insurance during this time. During this ten-year period, the Larsens and the City of Beloit had a number of disputes with Home Insurance concerning Officer Larsen's medical expenses, some of which were resolved only after one side or the other filed a petition with Wisconsin's Worker's Compensation Division. In connection with one of these disputes, the City Council passed a resolution on August 3, 1987 providing for payment of specific medical bills and authorizing up to $2,000 in legal fees for the Larsens in the pending worker's compensation proceedings.

In one instance in 1993, Pamela Larsen named both Home Insurance and the City of Beloit as respondents in a petition to the Worker's Compensation Division. Eventually, Mrs. Larsen and the City reached an agreement whereby the City paid her over $81,000 for claimed expenses and she agreed to cooperate in obtaining reimbursement for that amount from Home Insurance. In April 1996, the parties reached a tentative settlement with Home Insurance, which the Beloit City Council approved. In May, however, Pamela Larsen informed the City Council that she would not sign the agreement unless the Council addressed her husband's future medical needs in addition to past bills.

On May 20, 1996, a company acting as Home Insurance's agent informed the City of Beloit that all future medical bills for Peter Larsen's care would have to be submitted directly to the insurance company. Any amounts the City advanced to pay such bills would be at its own peril. In response, the City Council passed a resolution on June 6 authorizing an interest–free loan to the Larsens if the insurer did not pay the medical bills on time and providing for the hiring of a medical case manager to assist the Larsens with future medical claims.

On July 6, 1996, the Larsens filed a complaint against the City of Beloit, its city manager, and its city attorney[1] alleging on the authority of 42 U.S.C. § 1983 that the June 6 resolution had deprived them of a

---

1. The initial complaint named the two City officers in their official capacities only. The Larsens' second amended complaint, which is the version upon which the summary judgment was based, added claims against both men in their personal capacities as well. For the sake of convenience, this opinion refers to the three defendants collectively as "the City."

federally protected property interest without due process of law, in violation of rights guaranteed by the Fourteenth Amendment. According to the complaint, a property interest had been created by the Council's prior resolutions concerning Officer Larsen's care, and the City had taken away that property without affording the Larsens or their counsel proper notice or an opportunity to oppose the new resolution. On July 15, the City Council adopted a resolution instructing the Larsens to submit all claims directly to Home Insurance and ordering City officials not to pay any more bills for Officer Larsen's medical care. This resolution also rescinded the June 6 resolution. The Larsens then amended their complaint to allege that the July 15 resolution violated their federally protected property interest in the City's payments for medical expenses, again without the notice and opportunity for response that they believe due process required.

After the City filed a motion for summary judgment on January 7, 1997, the Larsens asked the district court for leave to file a second amended complaint. At about the same time, two of the Larsens' present attorneys filed a motion to appear in the case *pro hac vice*, and the Larsens asked for an extension of time to respond to the City's summary judgment motion. The district court denied the motion to extend time, but on the day after their response to the summary judgment motion was due the Larsens filed a motion to reconsider that denial. On January 29, the district court granted an extension of the briefing schedule, allowed the two attorneys to appear *pro hac vice*, and gave the Larsens leave to file their second amended complaint.

At the same time, however, the court sanctioned the Larsens and their attorneys by awarding the City its reasonable attorneys' fees and costs incurred in opposing the three motions at issue. The court based its award of sanctions on a determination that the motions were without justification and "part of that further delay which has been orchestrated by plaintiffs' counsel from the commencement of this action to date." (Jan. 29, 1997 Order, at 1.) Counsel for the Larsens were not given prior notice that the court was considering sanctions, nor did the court afford them an opportunity to be heard regarding the issue of sanctions. On February 4, 1997, the court issued an Order fixing the amount of the sanctions at $1,286.75.

In due course the Larsens filed their second amended complaint, and the City quickly moved for summary judgment. In a Memorandum and Order dated February 27, 1997, the district court granted summary judgment in favor of the City, holding as a matter of law that the Larsens had not been deprived of a constitutionally protected property right. On March 6, the Larsens filed a motion seeking clarification of the court's Order, alleging that the Order did not address certain state law causes of action that they claimed were included in the second amended complaint. The City disputed whether any state law claims were in fact pleaded in that complaint. On March 21, the court issued an Order declaring that any state law claims that might have been included were dismissed without prejudice to the Larsens' right to refile them in state court.

The Larsens filed a timely notice of appeal; they ask this Court to reverse the grant of summary judgment on their § 1983 claim, reinstate the alleged state law causes of action, and overturn the sanctions imposed upon them and their attorneys. For the reasons stated below, this Court will grant their request only as to the last of these three matters. The opinion of the district court granting summary judgment in favor of the City of Beloit is affirmed, as is the dismissal without prejudice of any state law causes of action that might have been included in the Larsens' second amended complaint. The portion of the court's January 29, 1997 Order awarding sanctions against the Larsens and their counsel, along with the court's February 4, 1997 Order setting the amount of those sanctions, however, are vacated.

## I. THE LARSENS' § 1983 CLAIM

### A. Summary Judgment Standard

This Court reviews a grant of summary judgment *de novo*. *Cornfield by Lewis v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir.1993). Summary judgment is appropriate where "the plead-

ings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265. The court must construe the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in favor of that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202. Once the moving party has produced evidence to show that it is entitled to summary judgment, the nonmoving party must affirmatively demonstrate that a genuine issue of material fact remains for trial. *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir.1996).

In responding to a summary judgment motion, the nonmoving party may not simply reiterate the allegations contained in the pleadings. "The object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695. Moreover, a genuine issue of material fact is not shown by the mere existence of *"some* alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. at 2510, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538. Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

*B. The Absence of a Constitutionally Protected Property Right*

■ In order to succeed, an action brought under 42 U.S.C. § 1983 must possess two elements: the conduct complained of must have been under color of state law, and it must have deprived a person of rights, privileges, or immunities guaranteed by the Constitution or laws of the United States. *Bayview–Lofberg's, Inc. v. City of Milwaukee*, 905 F.2d 142, 144 (7th Cir.1990). The thrust of the Larsens' claim is that the Beloit City Council's decision to discontinue its practice of paying for many of Officer Larsen's medical bills and then submitting them to Home Insurance for reimbursement deprived the couple of a constitutionally protected property interest without affording them due process of law, thereby violating rights guaranteed by the Fourteenth Amendment.

■ The Larsens bear the burden of proving that a property interest entitled to the Fourteenth Amendment's procedural protection exists. *Petru v. City of Berwyn*, 872 F.2d 1359, 1361 (7th Cir.1989). The Supreme Court has pointed out that such property interests "may take many forms." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548. Examples of property interests the Court has found to give rise to a requirement of due process include welfare benefits under statutory and administrative standards defining eligibility for them, *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287, and tenured employment in a public college, *Slochower v. Board of Educ.*, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692.

■ "Property interests, of course, are not created by the Constitution. Rather, they are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. In a companion case to *Roth*, the Court stressed that this formulation meant

that "property" interests subject to procedural due process protection are not limited by a few rigid, technical forms.... A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.

*Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699. The Larsens base their claim on the contention that they possessed a property interest created both by rules passed pursuant to state law—the resolutions

the City Council adopted—and by a mutually explicit understanding—the agreement exchanging prepayment of medical bills for Mrs. Larsen's promise not to sue the City or "go public" with her grievances, evidenced by the eleven years during which both parties adhered to the bargain.

### 1. The City Council Resolutions

The district court found that the City's actions did not deprive the Larsens of any constitutionally protected property right. First, the court rejected the Larsens' argument that the City Council's resolutions were in effect ordinances that established an entitlement to the City's prepayment of medical bills for the rest of Peter Larsen's life. The court also held that even if the enactments were ordinances, they established only a method of payment rather than a substantive right to the medical benefits themselves, and therefore created no constitutionally protected property right.

■ A city ordinance can create a protected property interest if it establishes substantive criteria that, if met, entitle an individual to the property. *Bayview–Lofberg's,* 905 F.2d at 145. Wisconsin law, however, distinguishes between ordinances, which are "of a general, permanent nature," and resolutions, which are "informal enactment[s] of a temporary nature." *Cross v. Soderbeck,* 94 Wis.2d 331, 288 N.W.2d 779, 784 (1980) (quoting *Wisconsin Gas & Elec. Co. v. Fort Atkinson,* 193 Wis. 232, 213 N.W. 873, 878 (1927)). The parties seem to be in agreement that a resolution could only give rise to a protected property interest, or at least a lasting one, if it were in reality an ordinance despite its denomination as a resolution. The State's statutes provide that ordinances must be published in a prescribed manner within fifteen days of their passage, Wis. Stats. § 62.11(4)(a), and that ordinances shall take the form, "The common council of the city of ... do ordain as follows." Wis. Stats. § 62.11(3)(f). The Beloit City Code, in turn, provides that "[e]very ordinance or resolution in the nature of an ordinance" shall have three separate readings in Council meetings before it can be passed. Beloit, Wis.Code § 2.07.

The parties go to great lengths to prove that the resolutions establishing the procedure for prepaying Officer Larsen's medical bills either were or were not read three times prior to passage and published after passage. It appears from the record that at least as to the first resolution-that of November 4, 1985—the Larsens may have presented enough evidence to create a genuine issue as to reading and publication. In addition, the absence of the prescribed language for an ordinance ("The common council of the City of ... do ordain as follows") does not necessarily defeat the Larsens' argument. The Supreme Court of Wisconsin has held that this statutory "style" for ordinances is directory rather than mandatory. *Cross,* 288 N.W.2d at 783–784 (holding ordinance valid despite departure from statutory language).

■ But the parties' dispute over publication and reading is not determinative of the issue, for the Larsens' argument fails on two other grounds. First, the Council's resolutions simply are not the kind of "general, permanent" enactments that ordinances under Wisconsin law are supposed to be. The resolutions, particularly the second and third of the three, "provid[e] for the disposition of a particular piece of the administrative business of [the City]." See *id.* Rather than setting forth any generally applicable policy with regard to benefits for injured police officers, they state how the City will deal with the administrative difficulties produced by Home Insurance's delays and refusals with respect to Officer Larsen's medical bills. If the City Council had unambiguously denominated the enactments as ordinances and passed them with all of the formalities associated with ordinances, then the informal, nongeneral subject matter most likely would not defeat their status as ordinances. But here the presumption is the other way: the Council denominated two of the enactments as resolutions and the other as a "statement." Given this fact, the subject matter of the enactments carries great weight, and they must be considered as resolutions rather than ordinances.

Second, even if the resolutions were ordinances, the district court was correct to hold that they did not give rise to a protected property interest. The resolutions did not create any substantive entitlement to the

payment of medical expenses. That entitlement existed already as a result of Wisconsin's Worker's Compensation Act. Because Officer Larsen was injured in the exercise of his duties, the Act required the City's worker's compensation insurance carrier to pay his reasonable and necessary medical expenses. See *Lisney v. Labor & Indus. Review Comm'n,* 171 Wis.2d 499, 493 N.W.2d 14, 22–23 (1992). The Council's resolutions merely established a method of payment whereby the City would prepay some bills in order to minimize the inconvenience to the Larsens. The resolutions did not establish substantive criteria for the entitlement to property and therefore did not give rise to a constitutionally protected property interest. See *Bayview–Lofberg's,* 905 F.2d at 142.

The Larsens' reliance on *Cushing v. City of Chicago,* 3 F.3d 1156 (7th Cir.1993), to defeat this conclusion is misplaced. In *Cushing,* this Court held that an injured firefighter who alleged that he was deprived of payment of his medical expenses without prior notice or an opportunity to contest the decision had stated a claim under § 1983. *Id.* at 1161. The case is clearly distinguishable, however, because it involved the firefighter's substantive entitlement to the payments themselves, rather than the right to a particular method of payment.

### 2. *The Alleged Oral Agreement and the Parties' Course of Conduct*

■ The Larsens also claim that they have a protected interest in the City's prepayment of medical expenses because the City committed to the prepayment procedure in exchange for Pamela Larsen's agreement, among other things, not to sue the City for her husband's injuries. They buttress this contractual argument by pointing to the "custom and practice" established over the eleven or so years during which the City paid most of Officer Larsen's medical bills. This mutually binding obligation, the Larsens conclude, created a constitutionally protected property interest in the prepayment of medical expenses. See *Common v. Williams,* 859 F.2d 467, 470 (7th Cir.1988) (stating that "a legitimate entitlement" can arise from custom and practice that embodies "an expectation . . . that was legally enforceable, a mutually binding obligation") (internal quotations omitted).

Many problems arise in connection with these arguments. The first springs from the haphazard manner in which the Larsens have advanced them. The Larsens' second amended complaint does not mention the alleged agreement with Council member William Watson anywhere in its ninety–seven numbered paragraphs setting out the "nature of the claim." Nor is the argument raised in the eight numbered prayers for relief, the second of which summarizes all of the other grounds upon which the Larsens base their claim of a protected property interest. (R.53.) The complaint, though not a model of precise drafting, makes out relatively clear claims that both the City Council's resolutions and their course of conduct were sufficient to create a protected property interest in prepayment. The document is devoid, however, of any suggestion that an explicit oral agreement might also underlie the protected interest.

The Larsens' response to the City's motion for summary judgment, on the other hand, does argue that the November 4, 1985 resolution was part of an agreement by which Pamela Larsen agreed not to sue the City for "negligent dispatching" in connection with her husband's injury or to "tak[e] . . . her cause to the citizens of the City of Beloit and/or to the media," and pledged to cooperate in the City's efforts to recoup its expenditures from Home Insurance. (R.54, at 4, 18; R.83 ¶¶ 30–33.) Even here, the Larsens did not so much as mention the alleged oral agreement with Council member Watson. That agreement, so far as this Court can determine, is first advanced in the Larsens' briefs on appeal. Because arguments not raised below cannot be pressed for the first time in this Court, *Gagan v. American Cablevision, Inc.,* 77 F.3d 951, 966 (7th Cir. 1996); *Jean v. Dugan,* 20 F.3d 255, 265 (7th Cir.1994), the claim that Council member Watson and Mrs. Larsen entered an oral agreement has been waived.

Even were it not for the waiver, however, the argument based on the alleged agreement with Watson rests on extremely shaky ground. The Larsens' briefs to this Court, which as noted mark the first appearance of the Watson conversation in their written fil-

ings in the case, do not attempt to explain how a single member of the City Council acting alone might possess the authority, either actual or apparent, to bind the City to such an oral agreement.

Stripped of the alleged oral agreement, the Larsens' contractual argument boils down to two elements: the bare assertion by Mrs. Larsen and her attorneys that the November 4, 1985 resolution was the City's part of an agreement with Mrs. Larsen, and the argument that the parties' course of conduct over the succeeding eleven years reinforced or itself created the contractual relationship.

Yet the City denies that any agreement existed. It claims that the resolution was merely a measure that City officials took as an expression of the citizenry's gratitude to and concern for Peter Larsen. In response, the Larsens offer nothing but conclusory assertions that the resolution was part of a mutual understanding with the City. "[A] plaintiff's own uncorroborated testimony is insufficient to defeat a motion for summary judgment." *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 939 (7th Cir.1997).

Still further, the alleged contract, if it existed at all, would be extremely vague in its terms. Did the City undertake to pay Officer Larsen's medical bills until he either recovered or died? Or was the agreement terminable at will? Did Mrs. Larsen's promise not to plead her case to the media or the citizens of Beloit preclude her entirely from giving interviews or speaking to community groups about her husband's shooting? Exactly what did her pledge to assist the City in recovering the money it paid from Home Insurance entail? It is quite possible that a contract whose terms were so uncertain would be unenforceable. See, e.g., *Westowne Shoes, Inc. v. Brown Group, Inc.*, 104 F.3d 994, 996 (7th Cir.1997). In any event, the vagueness of the alleged agreement causes the Larsens' argument to collapse back upon the refrain of "course of conduct": if the terms are to have any certainty, it must come from the parties' actual practice over the years the agreement was supposedly being observed.

In this regard, it appears that Mrs. Larsen herself did not always utilize the City's prepayment procedure. Over the course of the eleven years from 1985 to 1996 she submitted a number of medical bills directly to Home Insurance. She also initiated petitions against Home Insurance before the Worker's Compensation Division, rather than leaving the City to pursue reimbursement for the amounts allegedly due. These actions suggest that the custom between the parties was an informal arrangement by which Mrs. Larsen could either pursue a given payment herself or refer it to the City for action, depending upon convenience, the family's cash flow at the moment, or any other factors she wished to consider.

All of this is not to suggest that in order for the parties' practice over the eleven years to have given rise to a protected property interest Mrs. Larsen would have had to refer every single medical bill, no matter how small, to the City for prepayment. Given the absence of any other source to define the parties' obligations under the alleged agreement, however, Mrs. Larsen's somewhat haphazard reliance on the City's offer to advance funds does not do much to dispel the impenetrable aura of vagueness that surrounds the supposed contract.

In these circumstances, the parties' course of conduct is insufficient to establish a protected property right in the prepayment of medical bills. The Larsens offer no solid evidence of an explicit agreement that would make the eleven years of prepayment by the City look like anything more than an admirable effort to take care of a fallen police officer. The City's subsequent decision to stop taking care of Officer Larsen in that way does not implicate rights protected by the Constitution, and summary judgment was therefore appropriate on the § 1983 claim.

## II.  THE LARSENS' ALLEGED STATE LAW CAUSES OF ACTION

After the district court granted summary judgment for the City on the § 1983 claim, the Larsens moved for clarification, alleging that the court's Order had not disposed of state law claims for breach of contract, prom-

issory estoppel, third–party beneficiary relief, and intentional infliction of emotional distress. The court held a hearing on the question in which it opined that the Larsens had not in fact alleged any state law causes of action with the specificity required by Federal Rule of Civil Procedure 8, because they had buried scattered references to the alleged causes of action within the body of their second amended complaint. In its Order stemming from the hearing, however, the court assumed that the Larsens had indeed pled the state law causes of action. It then exercised its discretion to dismiss those claims without prejudice because the underlying federal cause of action had been dismissed. See 28 U.S.C. § 1367(c); *Timm v. Mead Corp.*, 32 F.3d 273, 276–77 (7th Cir. 1994).

The decision to dismiss supplemental state law claims is discretionary; this Court will reverse only if the decision was based upon an erroneous view of the law or upon clearly erroneous factual findings. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 400, 402, 110 S.Ct. 2447, 2458, 110 L.Ed.2d 359. The Larsens cite authority showing that a district court *may* exercise supplemental jurisdiction over state law claims after dismissing the claims upon which federal jurisdiction was premised if the state law claims are ripe for decision, the applicable state law is straightforward, and discovery has been completed. See *Timm*, 32 F.3d at 277. This principle, which is certainly valid so far as it goes, does not mean that the district court *must* exercise supplemental jurisdiction where all three conditions are satisfied. The decision is still discretionary. Moreover, the court in this case quite properly doubted whether the alleged state law claims had even been pled with sufficient clarity and specificity. If they had not, then it would be ridiculous to suggest that the claims were "ripe for decision," because the City would have had no opportunity to respond to them. In the face of such doubt, it was by no means an abuse of discretion for the district court to dismiss the alleged claims without prejudice.

## III. THE SANCTIONS IMPOSED ON THE LARSENS AND THEIR COUNSEL

In its January 29, 1997 Order, the district court sanctioned the Larsens and their attorneys by requiring them to pay the City's attorneys' fees and costs incurred in opposing three motions that the court considered dilatory. The court stated that the motions were "a part of that further delay which has been orchestrated by plaintiffs' counsel from the commencement of this action to date." A second Order, dated February 4, 1997, set the amount of the sanction at $1,286.75.

It is not clear from the Orders whether the court imposed its sanctions under Federal Rule of Civil Procedure 11, under 28 U.S.C. § 1927, or pursuant to its inherent powers to manage litigation before it. In any case, however, the imposition of sanctions requires that the party to be sanctioned receive notice of the possible sanction and an opportunity to be heard. Rule 11(c), for instance, explicitly requires "notice and a reasonable opportunity to respond." Rule 11(c)(1)(B) further prescribes that, when the court itself initiates the suggestion of sanctions, it should "enter an order describing the specific conduct that appears to violate subdivision (b) [the substantive subdivision of the Rule] and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto." See *Johnson v. Waddell & Reed, Inc.*, 74 F.3d 147, 150–151 (7th Cir.1996). Similarly, sanctions imposed pursuant to 28 U.S.C. § 1927 require prior notice and an opportunity to respond. *Kapco Mfg. Co. v. C & O Enters., Inc.*, 886 F.2d 1485, 1494–1495 (7th Cir.1989) (holding that due process requires notice and an opportunity to respond, but not necessarily a hearing); see also *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767, 100 S.Ct. 2455, 2464–65, 65 L.Ed.2d 488 (stating that notice and opportunity to be heard are generally required before awarding attorneys' fees). Finally, even the court's inherent power to sanction is to be exercised by means of a rule to show cause or similar

procedure, rather than by the sudden imposition of sanctions with no opportunity to respond. *Chambers v. NASCO,* 501 U.S. 32, 40, 50, 111 S.Ct. 2123, 2130, 2135–36, 115 L.Ed.2d 27 (approving sanction of attorneys' fees on trial court's inherent power, but only "after full briefing and a hearing," and noting that due process requirements apply to such sanctions).

The record is clear, and counsel for the City admitted at oral argument, that the district court did not give counsel for the Larsens notice or an opportunity to respond before imposing the sanctions. For that reason, this Court vacates the award of sanctions against the Larsens and their attorneys. Because of our resolution of this matter, this Court does not reach the question whether the district court abused its discretion in determining that the three motions that gave rise to the sanctions were dilatory.

## CONCLUSION

For the reasons stated above, the district court's grant of summary judgment for the City on the Larsens' claim under 42 U.S.C. § 1983 is affirmed, as is the court's dismissal without prejudice of any remaining state law causes of action. The portion of the district court's Order of January 29, 1997 awarding sanctions against the Larsens and their attorneys, as well as the Order of February 4, 1997 determining the amount of those sanctions, are vacated. Each party shall bear its own costs on this appeal.